# CASES

ADJUDGED IN

# THE PREROGATIVE COURT,

## JANUARY TERM, 1838.

WILLIAM PENNINGTON, ESQ. ORDINARY.

---

## JOSEPH V. WHITENACK and HENRY WHITENACK v. URIAS STRYKER and JOHN H. VOORHIES.

The presumption of law is in favor of testamentary capacity, and he who insists on the contrary has the burden of proof, except where insanity in the testator has been shown to exist at a time previous to the execution of the will; in that case the onus is shifted, and the party offering the will is bound to show that it was executed at a lucid interval.

The time of the execution of the will is the material period to which the court must look to ascertain the state of mind of the testator; and although it is competent evidence to show the state of the testator's mind at any time previous or subsequent to the execution of the will, yet such proof is always liable to be overcome by satisfactory evidence that the testator, at the time he executed the writing, had the possession of his faculties.

The testamentary witnesses, their opinions, and the facts they state as occurring at the time of the execution of the writing, are to be particularly regarded by the court.

The opinions of witnesses other than the testamentary, as to the capacity of the testator, are to be received as the slightest kind of evidence, except so far as those opinions are based on facts and occurrences which are detailed before the court.

Witnesses are to state the facts; and it is the business of the court, from those facts, to pronounce the opinion, upon settled rules and guides, whether the testator is competent or not.

[Whitenack v. Stryker and Voorhies.]

Old age, failure of memory, and even drunkenness, do not of themselves necessarily take away a testator's capacity. He may be ever so aged, very infirm in body, and in habits of intemperance, and yet in the eye of the law possess that sound mind necessary to a disposition of his estate.

It is not indispensable that the party offering a will or codicil for probate produce all the witnesses, provided those produced prove its due and legal execution.

The witnesses must attest the will at the request of the testator, but it is not necessary that the testator should openly make the request. His acquiescence when the witnesses are called in for that purpose by another, is sufficient.

Upon a question of capacity, an inquisition of lunacy is competent but not conclusive evidence.

In cases of doubt, requiring full investigation, costs before the orphan's court, and also the costs of appeal, with reasonable counsel fees on the hearing, will be directed to be paid out of the testator's estate.

THIS case came before the court upon an appeal from the decree of the orphan's court of the county of Somerset. On the death of Abraham Whitenack, of said county, three writings were presented to the surrogate for probate; one purporting to be the last will and testament of Abraham Whitenack, bearing date the 23d day of March, 1830; one purporting to be a codicil to that will, bearing date the 31st day of August, 1833; and another, purporting to be a second or further codicil, bearing date the 11th day of August, 1835. A caveat against the probate of any of the said paper writings, was filed by Urias Stryker and John H. Voorhies, sons-in-law of the testator, and the respondents in this court. Many witnesses were examined before the orphan's court, counsel were heard, and at January term, 1837, a decree of that court was made, admitting the paper writing purporting to be the last will and testament to probate, and rejecting both the codicils. The orphan's court further directed the costs to be paid out of the testator's estate. The decision of the orphan's court as to the will was acquiesced in, but an appeal was taken from that decision so far as it relates to the two codicils. The question came before this court upon the validity of the first and second codicils.

3

[Whitenack v. Stryker and Voorhies.]

*Frelinghuysen*, for appellants.

In investigating the question of testamentary capacity, the time of executing the will is principally to be regarded, and the testamentary witnesses are the most important. 4 *Wash. C. C. R.* 262, 268; 11 *Ves. jr.* 11; 19 *Ibid*, 494; 5 *Cond. Eccles. Rep.* 411; 1 *Ibid*, 47; 2 *Ibid*, 371; 3 *Stark. Ev.* 1707, n. 2.

The presumption of law is in favor of capacity, and against fraud. 4 *Wash. C. C. R.* 269; 1 *Swinb.* 122; 1 *Ibid*, 132, *sec.* 5, 6.

Old age, of itself, will not render a testator incompetent; nor drunkenness, unless he be at the time under its immediate influence. 3 *Stark. Ev.* 1703, n. 1; 5 *John. Ch. Rep.* 158.

Failure of memory is no ground of objection to a testator's capacity, unless it extend to a knowledge of his family and friends. It is enough that the testator understands the business in which he is engaged. 3 *Stark. Ev.* 1705, n. 1; 8 *Mass.* 371; 3 *Serg. and R.* 267; 2 *Phill. Ev.* 191; *Swinb.* 187, 164, *sec.* 10 and 11; 2 *Southard*, 675; 4 *Wash. C. C. R.* 267.

A man may by fair argument or persuasion induce another to make a will in his favor. 3 *Stark. Ev.* 1707, n. 1.

The influence to impair a will must be coercive and forcible. 3 *Cond. Eccles. Rep.* 254; 1 *Ibid*, 336; 2 *Law Library*, 209, 202. *Wyatt's case.*

The inquisition of lunacy against the testator is not conclusive as to his capacity to make a will. *Highmore on Lunacy*, 34; 3 *Stark.* 1702, n. 1, 1707.

The mere opinions of witnesses, other than the testamentary witnesses, are not to be regarded. 3 *Stark.* 1707, n. 2.

*W. Thomson* and *Hartwell*, for respondents, contra.

They cited *Rev. Laws*, 224, *sec.* 3; *Ibid*, 7, *sec.* 2; 2 *Law Library*, 203, (*Shelford on Lunatics*;) *Ibid*, 4, 180; *Phill. Ev.* 434; 2 *Bl. Com.* 282, *in notes*; 2 *Law Library*, 162, 9; 6 *John. Ch.* 375; 2 *Law Library*, 76, 41; 8 *Mass.* 371; *Beck's Med. Jur.* 366–7, 356.

[Whitenack v. Stryker and Voorhies.]

They insisted that the inquisition must be overcome by proof. 5 *Hals.* 217.

That all the attesting witnesses must be examined, and it must appear that they subscribed as witnesses, *at the request of the testator.* 2 *Chitty's Blac.* 302–3 ; 3 *Stark. Ev.* 1692.

*Nevius,* in reply.

THE ORDINARY. The principles of law applicable to cases of this character have become well settled, and it is very important to adhere to those rules which long experience has fully tested to be wise, in considering so important a question as that of the capacity of a testator. The following general rules and principles (and which are all that are necessary to be ascertained for the purposes of this cause) may, I think, be considered as well settled. In fact, upon the hearing there seemed to be no difference among the counsel as to the general principles of law, but the case turned mainly on the evidence. The first principle is, that the presumption of law is in favor of capacity, and that he who insists on the contrary has the burden of proof, except where insanity in the testator has been shown to exist at a time previous to the execution of the will ; in that case the onus is shifted, and the party offering the will is bound to show that it was executed at a lucid interval. 2. That the time of the execution of the will is the material period to which the court must look, to ascertain the state of mind of the testator ; that although it is competent evidence to show the testator's mind at any time previous or subsequent to the execution of the will, yet such proof is always liable to be overcome if it be satisfactorily shown that the testator, at the time he executed the writing, had the possession of his faculties. 3. That of all the witnesses the testamentary witnesses, and their opinions, and the facts they state as occurring at the time, are to be particularly regarded by the court. They are placed around the testator for the very purpose of attesting, after his death, to the circumstances under which so solemn an instrument is executed. 4. That the opinions of

witnesses other than the testamentary witnesses, as to the capacity of the testator, are to be received as the slightest kind of evidence, except so far as those opinions are based on facts and occurrences which are detailed before the court. It is most evident, that if the mere opinion of a witness as to the testator's capacity was to prevail, it would become necessary for the court to become acquainted with the witnesses themselves; for while the view of such a question which a man of strong clear mind and knowledge might take, would be very important, that of another of a different character would have very little weight. Besides, it will be found that every witness has a standard of capacity of his own, and he judges all cases by that rule. Witnesses are to state the facts, and it is the business of the court from those facts to pronounce the opinion, upon settled rules and guides, whether the testator is competent or not. And 5. That old age, failure of memory, and even drunkenness, do not of themselves necessarily take away a testator's capacity. He may be ever so aged, very infirm in body, and in habits of intemperance, and yet in the eye of the law possess that sound mind necessary to a disposition of his estate.

These principles will be found to be fully supported, and more at large, in the following cases:—4 *Washington Cir. Ct. Reports*, 262, 9; 11 *Vesey*, 11; 5 *Cond. Eccles. Rep.* 411; 1 *Ibid*, 47; 2 *Ibid*, 371; 1 *Swinb.* 122; 5 *John. Ch.* 158–9; 2 *Phillips on Evidence*, 191; 8 *Mass.* 371.

Holding myself bound by these rules, and which must approve themselves to the judgment of every man, I come to consider the main question in the cause: Was the testator, at the time he executed the two codicils in question, of sound and disposing mind and memory?

The first witness whose evidence I shall consider, is Nicholas Williamson. He is a witness to both the codicils, and a neighbor of the testator. He says the testator executed the first and second codicils in his presence, and in the presence of the other subscribing witnesses; that he frequently called to see the testator as a neighbor, and never perceived his mind failed him. He cannot

say whether he was sent for, or came in accidentally at the time of executing the first codicil. The testator informed him that he had been to Somerville and consulted governor Vroom about making a codicil to his will, and not having the will with him, the governor told him that he would write a codicil and send him. He handed to witness the copy of the codicil which the governor had drawn, and requested him to draw one according to that form, which he did at once, and having first read it to the testator asked him if it was right, and he said it was. He said the governor told him if there was room enough on the will, he might write the codicil on it, if not it might be written on a separate paper and annexed to it. The testator explained to him his reasons for making this first codicil. One of his executors was dead, and another he wished changed. He wanted Henry Whitenack in the place of judge Stryker. He said judge Stryker had not used him well; that he had requested the judge to do some business for him which he had not done, and further that he had not paid that respect to him which he thought was due him. The witness says he had considerable conversation with testator on that occasion; he seemed impressed that if judge Stryker was continued executor, things would not work well with his estate. They talked about the revolutionary war. Testator told him that when the enemy were at Brunswick he acted as pilot to scouting parties; that the enemy found it out, and he dare not stay at home at night. He says he expressed himself rationally. Witness says testator was as sane as when they were young men together. He appeared to understand perfectly the situation and circumstances of his family, and the disposition of his property. Testator wrote his own name to the first codicil, and published and declared the same as his codicil. Witness thinks Mr. Baird came for him when second codicil was executed. That testator, about a week before, had told witness he meant to alter his will as it is altered in the second codicil; that he meant to have it done by a lawyer, as it was important to his family. He then stated his reasons; that he had an estate he had worked hard for, and he could not bear to see it squandered in the way

he saw it was going by his sons-in-law. That the way they were going on, they would spend all in a short time. He wished his daughters to have a living, and his estate to go to his grand-children in remembrance of what he had done. He dwelt on the idea that his sons-in-law wanted to make him out an idiot. Testator evinced no want of understanding. Said he had been advised to cut off his sons-in-law, but he would not. They were all his children. The sons-in-law had used him ill, but he wanted to distribute his property equally among his children. At the time of executing the second codicil, witness says testator repeated the same things. At the execution of the second codicil, it was read to testator by the witness, and he was asked if it was as he wanted, and he said it was. Testator then signed. At that time witness says testator had his reason as well as ever, or he should never have witnessed the codicil. There was considerable conversation. Witness knew testator near fifty years, and lived within a mile of him for thirty years immediately preceding his death. He went to see him often ; for the last eight or ten years, every three or four months. Testator was poor in bodily health for the last years of his life ; was subject to the asthma. He was close in money matters. Witness drew leases of lands for testator every winter down to the one preceding his death. He dictated the terms very accurately ; he did so to the last. He was a man who could see a great many faults in others. The witness took charge of the will and codicils at request of testator. He said he lived among strangers. Witness always considered testator as competent to transact his worldly business.

The next witness is Albert Saums ; who states, that he saw testator execute the first codicil ; that it was done in his presence, and in that of the other subscribing witnesses, and at the time it purports to have been executed. The three witnesses were present at the time. He was asked by Mr. Williamson (the last witness) to witness the will. The testator said that one of his executors would not do business for him when he was alive. Witness was there about half an hour. Testator published and pronounced the writing to be his codicil. Witness says he worked on the

farm where testator lived. Testator would walk round and talk with him often. The first codicil was executed the first season witness worked there. Testator talked about ordinary matters, and appeared to have his reason. Mr. Williamson read codicil to testator. Witness would have been willing to transact any business with testator. On one occasion he set witness right in regard to placing a beam in the cider-house, and gave his reasons for it. Witness worked there two seasons, and the first codicil was made about a week after he first came there. Testator was careful to prevent waste on the place. Testator was close in his dealings. He has known him twelve or fifteen years. Witness cannot say he ever thought the old man's mind failed him. At the time of executing the first codicil testator was as well as usual, walking about the room.

These are the only witnesses examined to the first codicil. They are both agreed in their testimony, and clear as to capacity. They state many facts, and give a rational account of the manner of its execution. The third witness, Barney Rynearson, was not produced as a witness, and by the papers no reason is assigned for his not being produced, though something was said on that subject by counsel on the argument. It was insisted by the caveators that this codicil could not be proved without the production of all the witnesses. I cannot think it indispensable to produce all the witnesses, provided those produced make out a due and legal execution of the will. It would certainly have been open to the caveators to have produced him, could they have varied the case by so doing. It was also contended, that the witnesses must attest the will at the request of the testator. This is certainly true; but it is not necessary to make out that request, that the testator should openly make the request. If it be done by his cheerful acquiescence when the witnesses are called in for that purpose, as in this case, by the friend of the testator, who had first completed the writing, and was himself a witness, it is sufficient.

John Atkinson is a witness with Nicholas Williamson (whose evidence has already been considered) to the second codicil. He

states that it was executed in his presence, and that of the other subscribing witnesses, at the time it bears date. Joseph, the testator's son, came for him. Testator was laboring at the time under a fit of the asthma. Mr. Williamson read paper to testator. Witness lived, for twenty last years, within a quarter of a mile of testator, and has known him thirty-five years. Has been in the habit of seeing and talking with him often. Testator, at the time this codicil was executed, was asked if he wanted to hear the original will read : he said yes, and it was read to him. When the codicil was read to him, Mr. Williamson asked him if it was all correct as he wished it, and he said it was. Before witness attested the paper, he asked testator his reason for making the change. He said his sons-in-law were spending his property, and he wished his daughters and grand-children to have some benefit from it. Witness talked no further at that time with testator, but he appeared to him to understand what he was about. There was a codicil presented to testator a few days before, but he refused to sign it, saying it was not right. This was the one brought by Mr. Vroom. Testator always appeared to understand his affairs. Witness staid with testator sometimes all night. Considered him capable of making bargains, and always understood his own interest.

Cornelius M'Colm. This is the third witness to second codicil. This witness sustains the other witnesses as to the execution of this codicil. He was called there by Joseph, but Joseph did not remain in the room at the time of the execution. He was there about half an hour. Has known testator thirty years, having lived all that time about one and a half miles from him. Says he has been afflicted at times, as long as he has known him, with the asthma. At intervals he would be quite smart. Witness considers testator, at the time of executing this codicil, as capable of making a will and disposing of his property as he ever was. The witness stated a number of families Joseph must have passed by in coming for the witness, living between his house and testator's.

These are the subscribing witnesses to the second codicil with

Nicholas Williamson. They all agree in the main facts—in the manner of the execution, and in the capacity of the testator. They are neighbors, familiar with him and his ways of thinking and acting. It is very rare that you will find witnesses corroborating each other more fully in every particular, than those to these two codicils.

In further support of the two codicils, Benjamin Young is produced as a witness. He says he knew the testator eleven years; saw him and had frequent conversations with him the last four years of his life—sometimes once or twice a week. When he talked with him, he appeared to have his mind. This witness gives a particular account of borrowing money of testator, and all that passed in July, 1835, showing a complete understanding in him of the whole business, and of the different standing of banks. He speaks of his son renting a farm of testator, and many things that were said at the time, and the conversation about the terms that took place. This was in the spring of 1834. That testator gave directions how the farm should be worked. That he insisted on it as the best plan in making fence, to have the bark on the rails. He relates a conversation between testator and Urias Stryker, his son-in-law, in which they disputed about the loan of money. He says his son-in-law, on that occasion, called the testator, for not letting him have more money, a liar, and a damned liar. He speaks confidently of testator's capacity, and says he never discovered that testator's mind failed him. The witness states that the conversation took place about the money, when Urias Stryker abused testator, in presence of John Huff, John Miner, and others, in the evening, at the testator's house. He further states, that he since spoke to Mr. Miner about that conversation, and he remembered it. He further states, that he was at testator's funeral, and that Mrs. Voorhies, the testator's daughter, made an attempt to burn the will, and Urias Stryker said, burn it up; but it was finally rescued by Mrs. Henry Whitenack.

Nothing could be more confirmatory of the testator's capacity than the whole of this witness's testimony. It is very particu-

4

liar, relates to a great many circumstances, and such as go to show a full understanding in the testator in relation to business transactions. But his testimony is impeached by the caveators on the ground that Miner and Huff, two of the persons stated by him to have been present at the time that Urias Stryker is said to have called the testator a liar, deny that they were present. They certainly do deny being present at any such conversation, and the caveators are entitled to all the benefit arising from this contradiction. They claim, however, that his whole evidence should be disregarded, because in this particular he has clearly stated what is disproved. I cannot think this would be just. While it certainly does take from that reliance which you would place on an accurate witness, yet it is not an impossible thing that the most honest man might speak truly of any particular transaction, and yet be utterly mistaken, from want of recollection, as to the persons present at the time. If a witness was corrupt, it is hardly to be supposed he would expose himself by naming persons as present at any particular transaction, when he knew they were at hand and might be called as witnesses to contradict him. James W. Todd is also called to state from memory some discrepancies in the evidence of this witness in this cause and when he was sworn on the first inquisition, which had taken place sometime previously; yet they will be found not to be on very material points. On the whole, I cannot discard this testimony, but am disposed to receive it with all that just allowance which the contradictions made to it are fairly entitled to.

Samuel B. Updyke, another witness in support of the will, speaks of being present at the loaning of fifteen hundred dollars by the testator, in which he spoke of the security he must have, preferring personal security to bonds and mortgages, as they were taxed; but as this witness states no time when this took place, much of its force is lost.

Samuel Saums, another witness, says he has known the testator for twenty years, and has lived within three-quarters of a mile from him. He occupied testator's distillery. This witness relates some conversations of ordinary character that he had from

time to time, showing mind in the testator, and some of them in the year 1833. He fully corroborates the evidence of Benjamin Young as to what took place at the testator's funeral, in the attempt to burn the will, by Mrs. Voorhies.

Abraham D. Baird testifies, that he has lived within a mile of testator for the last sixteen years, and during the last six years of his life had frequent conversations with him. Says testator was a singular sort of man. In 1832 he paid off a note to testator, who counted the money as accurately as any body. Has heard him speak of his family with tenderness. He considers testator competent to make a will, except under very severe spells of the asthma. This witness also speaks of the occurrence at the funeral, in the attempt to burn the will. He was present at the time the second codicil was written, and said it was not right, and he would not have it put to his will. He said he meant to have an additional codicil, and gave as a reason that if his sons-in-law spent money as they did in his life-time, what would they do when he was dead.

William Gray testifies, that in 1835 he lived in the house with testator, and had conversations with testator, though not a great deal. He lived there eight months, and saw him two or three times a day. This witness never considered him a man without his reason.

George A. Vroom testifies, that he saw testator four or five times after the first inquisition, and conversed with him each time. He drew the second codicil. On the 8th of August, 1835, he went to testator's and got his instructions for drawing it. When he came in he asked testator if he knew him. He said he did not. When he mentioned his name, he asked him if he was a nephew of old colonel Vroom. Witness said he was his grandson. Testator said he knew colonel Vroom very well. He then talked about altering his will. Said he wished to fix it so that his grand-children could have an equal share of their mothers' property. Testator gave him instructions for drawing the codicil. Said he wished his property out of the hands of his sons-in-law. Witness asked testator if he had any money out at Somerville.

He said yes, with Mr. Mann. Witness then asked him if Mr. Gore had not the money. He said yes, and Mann was the surety. He talked to him about his pension money, and asked if he should like to have some of it. He said he was like a blind man, he would rather see than hear tell of it. He was there near an hour, and talked with him on various subjects. The next day he returned with the codicil, and was reading it to him, when testator stopped him, and said it was not according to his direction. Witness says he then recollected it was not drawn according to his direction. He took it away, and drew it over, and sent it to him. Witness has no doubt of testator's competency. Joseph was not in the room: he came for him. He took him fifty dollars in gold, which he requested witness to keep for him.

This closes the testimony in support of the codicils, and a stronger case, standing by itself, I confess can hardly be made. All the testamentary witnesses (five in number) that have been examined, concurring in testator's capacity at the time, sustained by so many others who were his neighbors, and relating facts showing a rational mind, and those witnesses unimpeached except as to Benjamin Young.

I now proceed to examine the evidence in opposition to the codicils. There has been a mass of evidence taken, of which I shall feel bound to notice here only so much as bears on the question of capacity.

The first witness is James D. Stryker. This gentleman drew the original will in 1830, and was named one of the executors. He is very clear as to testator's capacity at that time. He uses this strong language :—" I don't think that I entertained the least doubt of his testamentary capacity at the time the will was executed." He says he complained much about his children, which was a habit with him. The testator's difficulty seemed to be to reconcile matters between his two sons. Sometime after writing the will, the witness went to take testator's examination upon an application for a pension. Then his memory, he says, appeared to be entirely gone. He complained of his want of memory. He thinks then he was not capable of doing business

from want of mind and memory together. This was in 1832. He could not recollect the name of any officer under whom he served. On further examination, witness says, testator *did not show any incapacity except what arose from want of memory.* Abraham went for witness to write the will.

It is most manifest, that this witness places himself mainly on want of memory in the testator; for by the very conversation he had with him, his complaining of his want of memory, all prove he had reason and understanding. In fact, the witness expressly says, the incapacity he speaks of arose from want of memory. This witness, it seems, at the very time of which he speaks, must have administered the oaths to him on his application for a pension. He speaks of " taking his examination." Would a witness of the high character of this gentleman, administer an oath to a man not understanding the subject? I have too high an opinion of his character to entertain any such belief. Besides, this very witness, on the first day of February, 1834, writes a letter to testator, which is made an exhibit in this cause, treating him as a man of understanding and capacity. Would he write such a letter to one without his reason? I think not. In fact, the witness in his examination says, that when he went to testator's to transact the business stated in that letter, the testator understood well enough what he was about.

Mrs. Catharine Van Arsdale. This lady relates many strange occurrences during the period of Abraham's (testator's son's) sickness. That he would get up in the night, come to witness's bed, sometimes two or three times of a night, and say the millennium had come. That the devil had him chained to the floor and was heaping hay on him. That the world was on fire. Seemed distressed and alarmed. He talked about witches. That Ann (his daughter-in-law) was a witch, and had come in through a small place in the window. That it rained fire and brimstone. He said there was a dreadful noise, and bid her listen : she did so, and there was no noise. She further states, that she was at testator's after the will had been sent for from judge Stryker's. Testator told her, Joseph had sent old Nicholas Williamson to judge

Stryker for the will, and had brought Atkinson along with him. Testator frequently spoke about dividing his property equally among his children. This witness considers the testator as failing since 1823. Says he would tell over the same story again. That he never went to bed in twenty years, but slept out of bed owing to his disease. After 1823 thinks him unfit to do business. She says he had understanding enough to know he was not fit to do business. Sometimes he seemed to understand his own interest and duties, and then appeared deranged. He would say every thing was dying off, he was afraid his cattle would die off. Testator was worried about Abraham's sickness : he sat by him most of the time : *was company for him.* She says she would not call her uncle (the testator) a *crazy man ;* she would call him a *feeble man.* Testator's children quarrelled among themselves. They sometimes had rough conversation with their father. She gives it as her opinion that testator was not able to make a will since 1820.

The impression is very clear from the evidence of this witness, that at times the testator's mind was out of order, wholly unfit to transact business. Nothing could more fully show it, than some of his conduct as related by this witness. His feeble health, old age, the dreadful disease with which he was afflicted, and his immediate affliction in the sickness and death of his son Abraham, with whom he lived, seemed to overpower his faculties, and for a time, it is most manifest, prostrated his reason. I cannot think this is shown by this witness to have been any thing more than temporary. It is quite obvious, that the opinions of this witness are quite too sanguine. She considers testator incompetent to make a will, or do any business, for ten years before the will of 1830, and yet that will has been sustained, acquiesced in by all parties, and upon clear testimony.

Mary Saums speaks of testator in 1834. Sometimes he appeared more rational than at others. He said it was no use for him to eat any more : that he should not live above a day or two. He after this ate very heartily. He stated as a reason why he should die, that he was very dry.

The whole amount of this evidence would go to prove a wandering mind in the testator at times, and yet again, according to the whole account, he would talk rationally. He spoke sensibly of the death of Mr. Voorest—that old men, if they took to drink, were soon taken off.

Joseph Whitenack says, Joseph told him he meant to get judge Stryker out of the will. Testator is represented as a man in the habit of running down his children, and complaining of their spending money. This witness is unwilling, clearly, to say whether in his opinion testator was competent in 1831, 1832 and 1833, to transact business. He says it's a hard question. He should not hardly think him competent. He was forgetful; sometimes he appeared rational, and then he would forget. He places his objection on the ground of his forgetfulness. In his best days he says testator had a curious way with him.

The whole of this witness's testimony is rather equivocal as to his opinion about testator's capacity. He either really doubts himself, or is unwilling to be committed on the subject.

Henry V. Staats says, he has lived since 1822 within a quarter of a mile of testator. The first he observed the old man's mind to fail was in 1830, or the fall before. From 1829 to 1834 did not think him competent to make a will disposing of his extensive property. At Abraham's sickness his mind was gone. He would come out of the house with a night-cap and apron on, and this was one reason he thought him incompetent. He would say his children cursed him. He thinks the old man knew *what property he had*, but did not know *the value of it*. He valued it too low.

This witness never had dealings with testator, nor was present when he dealt with others after 1830.

Henry Hurder had known testator forty years. Speaks of seeing him once, but at what time he does not say, at Kelly's mills, when he said his family used him ill, and said he had ruined them all. Witness thought he had failed, but not altogether lost his reason. He appeared to have lost his *resolution*. The old man, on another occasion, appeared to be under a delusion,

that all was going to destruction.   He did not think him compe-
tent to make a will after he returned into the neighborhood.   His
mind was more deranged by spells.   He talked to witness about
the Jews being God's chosen people : now, he said, the Metho-
dists were.   He wished he had died some years ago, and gave
as a reason, he would not have so many sins to answer for.   He
would sometimes talk rationally.   He had strange imaginations.
He always knew the witness.  .Since 1830 does not think him
competent to make a will.   This witness believes testator under-
stood the relation in which the different members of his family
stood to him, and to each other.   Spoke of once drawing him
out of the mud with his team. ·

This witness very clearly shows a wandering at times in tes-
tator's mind.   He mentions many facts.   At Abraham's death
he says he did not appear to be himself.

Abraham J. Van Doren knew testator thirty-five years.   In
1833, being the assessor, he called on testator for his property to
assess, and he said he had none.   His evidence is confined prin-
cipally to one fact.   I understand, from the whole case, that the
old man had before this put out his property, and that his sons
and sons-in-law occupied it.   He meant they should pay the
taxes.   I cannot think this evidence bears on the case as much
as counsel seemed to suppose.   The testator evidently meant to
get clear of the tax if he could.

William W. Hall speaks of setting up four or five nights with
testator in 1832 or 1833.   He talked about his property.   That
he wished each to have an equal share.   Said he was not com-
fortable, and asked him if he could not get some aged woman
to come and take care of him.

The whole conversation of this witness, as related by him,
instead of making against the testator's capacity, in my opinion
makes directly in its favor.   It seems rational, and just such as
a man circumstanced as testator was, would make.

John Huff knew testator for thirty years, and lived within
three-quarters of a mile from him.   He complained of his chil-
dren, that they did not do well.   Said his property would be

gone in four years. Says he spoke of his boys in a manner they did not deserve. He ascribed much of his conversation to imagination. Has heard him say he meant to do as well by one child as another. From 1830 till his death he did not consider him competent to make a will. Abraham died in 1831 or 1832. Has not seen testator so often since that event, but frequently before that. Believes he knew his farms and the property he owned, and for a part of the time apprehended justly the relationship existing between the different members of his family. The reason of the witness for thinking testator incompetent was his affliction in body and mind. He seemed to have no mind of his own; he was childish. He says he believes he understood his own interest.

It is very evident that this witness believed testator incompetent to make a will; but his reasons for that opinion are based on no very satisfactory foundation, so far as they are stated in his evidence.

Abraham Quick speaks of his being at testator's in 1832, during Abraham's sickness. He then complained that every thing was going wrong. He refers to some papers respecting a road, which he requested him to take charge of. This witness says, " I don't pretend to say that the old man was or was not capable of disposing of and managing his property."

Jacob R. Schenck. This witness is much relied on by the caveators. He relates a conversation wish testator during Abraham's sickness, from which he inferred his mind had failed him. He said that he was exhausted from old age. That he held but little conversation with him, for the reason that he considered him incapable of holding one. Says testator talked much about his property being spent, and complained of the extravagance of his son's wife. He says he never saw him commit any ridiculous or extravagant action. His test, he says, of testator, was pretty much confined to one conversation : he made up his mind from what he then saw and heard.

This witness evidently made up his mind at once against testator's capacity, and after that gave himself no further thought

about it. He speaks of him as miserly in his disposition. The time of Abraham's sickness, it would seem from all the evidence, was the worst period with the testator, and this is the time to which this witness refers.

William T. Davis made shoes for the family. Latterly he observed testator was not as rational as formerly. From being a politician he turned to complaining of his family. In 1833, the old man was quite childish by spells. Talked strange. He relates a course of conversation at this time, clearly showing that his mind wandered. 'He spoke of Prime as the proprietor of the farm. He fretted about every thing going wrong: called the stills balloons, and said they were building castles in the air. At times, he says, he would talk quite rational. From 1832 till his death, he would not think him capable of doing any business of importance. He does not think that testator was crazy, but that his health and age and family affairs had destroyed his mind. He knew his farms, and where they lay, and complained that Joseph could not make a living off the farm he was on. He thinks he knew the nature of the relationship between the different members of his family. He would answer questions sometimes correctly, and sometimes not.

No evidence more clearly than this, shows that testator was very different in the state of his mind at different times.

There are several other witnesses on the part of the caveators, but they are by no means as full or circumstantial as the above, nor do I perceive that they at all vary the general complexion of the case. They establish, beyond all doubt, from the year 1830, periods when the testator's mind, from the tenor of his conversation, was wandering, and at other times rational.

After the most careful examination of all the evidence on the part of the caveators, I can come to no other conclusion, than that the testator was, during the last years of his life, from 1830, at times affected in his mind; and I am equally clear, from the same evidence, that during the same time he had lucid intervals. Many of the witnesses speak of his talking at times rationally, and for an hour together: that he was in an especial manner

affected at the time of Abraham's death. The general character of the testator seems to have been, an inordinate attachment to property—a love of money. This led him to complain, as he left active life, that his sons, and all around him, mismanaged; and his great fear seemed to be that they would all come to want.

Taking this view of the evidence on the part of the caveators, in connexion with the very decided character of that on the part of the executors, I can bring my mind to no other conclusion, than that the weight of evidence is in favor of the capacity of the testator at the times he executed the first and second codicils. No witness meets the direct proof of capacity at the time, except it be by general opinion.

Another ground was taken by the counsel for the caveators; that the testator made these codicils under an improper influence. I can see no just ground in the evidence, for this charge. It is lawful, and every way proper, for a son to advise with, and influence by fair argument and reason, a father. It is natural that they should have more or less influence with him. I cannot see any threats made by the sons towards the father, to induce the making of these codicils. Joseph and Abraham both went, at different times, after persons to write the papers, but I observe they did not even remain in the room at the times they were dictated or executed. If the testator had been unfit to dispose of his property, or do any business, as some of the witnesses suppose, how is it possible he could have dictated these wills? And would these sons, if they had had the entire control of him, have left him at the very moment when it was most essential for them to be present? I should be very far from supposing the testator to be a man likely to be controlled. I should, from the evidence, rather suppose he was obstinate and self-willed. At all events, there is no sufficient evidence to sustain the ground of improper influence.

From looking into the will and codicils themselves, there seems to be no great motive for the sons to have used this influence to obtain the provisions made by the two codicils. The great ob-

ject of one was, to change the executors, and of the other, to place the property for the daughters in trust. They gained nothing themselves worthy of making use of such extraordinary and fraudulent means. Neither do I see any thing on the face of these papers improper or unreasonable. They carry the impress of a rational, just and fair man.

In the view which I have thus taken of this case, I am met by two inquisitions which have been taken in reference to this very testator, on commissions issued out of the court of chancery, one bearing date the 30th day of May, 1834, and the other the 1st day of January, 1836. By the first, the testator was found at the time of taking the same, a lunatic enjoying *lucid intervals*, and that he had been so for thirty months prior thereto. By the second, the testator was found to be of unsound mind, and mentally incapable of managing his affairs, and that he had been of unsound mind since December, 1832. These inquisitions are not pretended to be conclusive on the case; but it is claimed for them, that they are entitled to all that respect which is due to the opinions, thus expressed, of so large a number of the most respectable citizens of the county of Somerset. This is perfectly correct. They are entitled to all the respect which any men acting on the subject before them, could possibly have. Some of the jurors I know, and I respect no men among us more. Their business and mine is very different. They have decided, from the general character of the testator, that he was incompetent to manage his business: it is my duty to decide whether, at the times he executed two instruments of writing, he was of sound mind. With the first inquisition I am fully agreed. That affirms that the testator had lucid intervals. In truth, it is not quite certain that the jurors on the last inquisition would have been willing, from a view of the whole evidence, to have said the testator had no lucid intervals. I should have very little doubt that these very jurors would, one and all, upon this evidence, agree with me, that this testator was, at times, disordered in his mind during the last years of his life, and at times perfectly rational.

[Whitenack v. Stryker and Voorhies.]

It would have given me much pleasure, could I have agreed with the judges of the orphan's court who decided this cause. It is a case not without its difficulties, and while I know those gentlemen fully discharged their consciences in the decision they made, it is my duty now to see that I acquit mine.

I therefore reverse the judgment of the orphan's court of the county of Somerset, so far as it rejects the first and second codicils, and direct probate of the same to be made; and affirm it, so far as it directs the costs to be paid out of the testator's estate.

Considering this a case of some doubt, and well worthy of receiving a full investigation and decision, I direct the costs of this appeal, with reasonable counsel fees on the hearing before this court, to be taxed by the clerk, to be paid out of the testator's estate.